**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

RICKY LOTT, HOLLY HUGHES, TATYANA MALENKOVICH, AMY HAWKINS, RANDALL BRINK, AARON BERRY, STEVEN PATTERSON and JEFFREY JACKSON, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HEALTH GORILLA, INC.,

Defendant.

Case No.: 1:26-cv-21639-KMM

**CONSOLIDATED CLASS ACTION COMPLAINT**
(DEMAND FOR JURY TRIAL)

Plaintiffs, Ricky Lott, Holly Hughes, Tatyana Malenkovich, Amy Hawkins, Randall Brink, Aaron Berry, Steven Patterson and Jeffrey Jackson ("Plaintiffs"), by and through undersigned counsel, allege the following Consolidated Class Action Complaint against Health Gorilla, Inc. ("Defendant") based upon personal knowledge of facts, upon information and belief, and based on investigation of counsel states as follows:

## INTRODUCTION

1. Plaintiffs bring this class action lawsuit to hold Defendant accountable for granting access and failing to prevent multiple fraudulent actors from gaining unfettered access to millions of healthcare patients' records, including Plaintiffs, through the networks used by healthcare providers to share information with other healthcare providers for treatment purposes. Defendant served as the gateway for multiple bad actors to access, copy, and sell patient records for illicit and illegal purposes to the detriment of Plaintiffs and Class members.

2. Defendant does business as an "Implementer," in the Carequality framework, and

a Qualified Health Information Network ("QHIN") in the Trusted Exchange Framework and Common Agreement ("TEFCA"). The Carequality framework and TEFCA are two national frameworks responsible for more than a billion patient-record exchanges between healthcare industry participants every month. TEFCA is a federally sponsored interoperability framework for healthcare providers to exchange patient records to facilitate coordination and continuity of care for patients nationwide, and the Carequality framework is a similar private network. Both the TEFCA and Carequality framework are administered and maintained by the non-profit organization The Sequia Project.

3. Certain of Defendant's customers abused these networks for illicit commercial gain on Defendant's watch. Through thinly veiled disguises, they pose as healthcare providers and falsely certify that they are accessing electronic patient records over these networks for treatment purposes. Once they retrieve the records through network, they use or sell the records for profits and commercial exploitation.

4. As an Implementer/QHIN providing access to these bad actors, Defendant was contractually, ethically, and legally responsible for vetting their qualifications to access the system prior to granting them access, including conducting adequate and robust due diligence prior to approving their applications, and monitoring and verifying that their activity over the network was consistent with legitimate uses. Defendant failed on all counts.

5. Defendant's failures to safeguard and protect patient records of Plaintiffs and Class members and to maintain the integrity of the vast interoperability framework on which principles of continuity of care rely constitute moral, ethical, and legal violations of the highest order.

6. The bad actors were not vetted, and their activities were consistent with abuse. Despite these red flags, Defendant failed to take reasonable and necessary actions to put a stop to

their conduct, as it was required to do. To make it worse, Defendant attempted to conceal their conduct by defending the action of the bad actors and giving pretextual reasons for their suspicious behavior when others raised concerns.

7. As a result of Defendant's failures, Plaintiffs' and Class members' personal identifiable information ("PII") and protected health information ("PHI") (collectively "Private Information") was accessed and stolen by these bad actors.

8. On January 13, 2026, Epic Systems Corporation and certain other healthcare providers and business associates filed a lawsuit seeking injunctive relief against Defendant and a myriad of other entities and persons, to put a stop to the rampant fraudulent access, use, and disclosure of confidential patient records.

9. Upon information and belief, Plaintiffs' electronic health records were accessed for unauthorized purposes by one or more of the fraudulent actors identified in the January 13, 2026, Epic lawsuit. The bad actors identified in the breach were RavillaMed, Mammoth Path Solutions and MammothDx, SelfRx, and GuardDog Telehealth. Plaintiffs never sought treatment from any of these companies. As a result, Plaintiffs' and Class members' complete medical records were shared without authorization and without lawful purpose, by and through Defendant, to the bad actors (the "Data Breach").

10. Upon information and belief, these bad actors accessed the complete data set relating to Plaintiffs' health and wellbeing, clinical and administrative data, doctors' orders, office visit notes, procedures, consultations, emergency department visits, laboratory results, treatment information, and other related health information. All of this information was required to be kept confidential under patient-physician privilege and HIPAA.

11. On information and belief, the bad actors sold or used Plaintiffs' and Class

members' patient record data and the information that could be inferred therefrom to make prohibited targeted advertising, insurance claims decisions, and other unlawful, unscrupulous, and unethical practices.

12. Plaintiffs bring this lawsuit to obtain legal and equitable relief arising out of Defendant's unlawful actions and omissions.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

14. This Court has personal jurisdiction over Defendant, because its principal place of business is in Florida, and it does a significant amount of business in Florida.

15. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to this action occurred within this District and Defendant resides in this District.

## PARTIES

***Plaintiffs***

16. Plaintiff Ricky Lott is an adult individual and citizen and resident of Illinois, where he intends to remain.

17. Plaintiff Holly Hughes is an adult individual and citizen and resident of Ohio, where she intends to remain.

18. Plaintiff Tatyana Malenkovich is an adult individual and citizen and resident of Oregon, where she intends to remain.

19. Plaintiff Amy Hawkins is an adult individual and citizen and resident of Missouri, where she intends to remain.

20. Plaintiff Randall Brink is an adult individual and citizen and resident of Pennsylvania, where he intends to remain.

21. Plaintiff Aaron Berry is an adult individual and citizen and resident of Illinois, where he intends to remain.

22. Plaintiff Steven Patterson is an adult individual and citizen and resident of Virginia, where he intends to remain.

23. Plaintiff Jeffrey Jackson is an adult individual and citizen and resident of New York, where he intends to remain.

***Defendant***

24. Defendant is a Delaware corporation with its principal place of business located at 121 Alhambra Plaza, Suite 1000, Coral Gables, FL 33134.

## FACTUAL BACKGROUND

### A. TEFCA and the Carequality Interoperability Framework

25. TEFCA is a federal statutorily-created framework for nationwide standardized sharing of electronic patient records. It was created by Congress in the 21st Century Cures Act. It was launched in 2023 and provides the network, directories, standardized procedures, and data use agreements between healthcare providers, patients, payers, and government agencies.

26. "TEFCA establishes a universal floor for interoperability—creating a path for data to be shared beyond proprietary boundaries. TEFCA enables providers, payers, public health professionals, and patients to access and securely share health information regardless of where the information is stored. This helps providers coordinate patient care and ensures that patient data

follows the patient, even when switching providers, among a wide variety of additional benefits."[1]

27. Carequality is a non-profit organization that administers and maintains a central directory that includes the electronic endpoints that enable communications primarily among healthcare providers. Carequality is a "national-level, consensus-built, common interoperability framework to enable exchange between and among health data sharing networks. Carequality defines the technical and policy agreements to standardize data flow among networks of electronic health record vendors, record locator service providers, and the healthcare providers that use these vendors' networks.

28. Carequality and TEFCA both are a "network of networks" that work alongside one another to facilitate the sharing of electronic patient records. These frameworks are available for health information networks, vendors, and payers.

29. Once a user is entered in the framework's directory and distributed throughout the network, the user can query and take patient's records of other participants in the network, as long as it asserts one of a limited menu of valid purposes, *e.g.*, for treatment, payment, research, etc. Typically, such a query requires basic patient information (name, address, date of birth). With that basic information and certification of a valid purpose as inputs, users gain instant access potentially to complete records of the queried subject.

30. Because of this ease of access, the network relies on Defendant to vet its users before signing them up, and to actively monitor its users' conduct to ensure that they are using their access permissibly and appropriately and only accessing the minimum necessary for the stated purpose of their requests.

[1] https://healthit.gov/policy/tefca/ (last visited May 20, 2026).

***Defendant Agreed to Vet and Monitor the Bad Actors***

31. To join the Carequality framework, Defendant executed a contract called a Carequality Connected Agreement ("CCA"). The CCA requires Defendant to impose Carequality Connection Terms ("CC Terms") as a contract on all entities Defendant connects to the Carequality network.

32. Sections 7, 15.2, and 15.4 of the CCA require Defendant to ensure that its users comply with the CC Terms and all applicable components of the Implementation Guides and Carequality Policies.

33. Section 15.3 of the CCA requires Defendant to uniquely identify each user prior to granting access to the framework.

34. Section 13 of the CCA requires that Defendant "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides." Section 13 specifically limits entities that are not "covered entities" under HIPAA or government entities to using the framework for permissible purposes.

35. On information and belief, the bad actors who abused the system on Defendant's watch agreed to standard CC Terms.

36. TEFCA requires participants to agree to the "Common Agreement."

37. On information and belief, Defendant agreed to the Common Agreement.

38. Section 7.4.1 of the Common Agreement provides that "[t]o the extent not prohibited by Applicable Law, [Defendant] shall be responsible for its acts and omissions, and the acts or omissions of its Participants and their Sub participants." By agreeing to this requirement, Defendant agreed to be responsible for the actions of the bad actors who stole Plaintiffs' and Class members' patient records.

39. The applicable contract provisions require Defendant to abide by terms of the agreement and to require that users do so also. Section 13.2.2 of the Common Agreement make Defendant responsible "for taking reasonable steps to confirm that all of its Participants and Sub participants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3."

40. Defendant is also required by Section 13.2.2 of the Common Agreement to notify its Participants and Sub participants when they are in breach of applicable rules, and to terminate and suspend Participants and Sub participants when warranted.

41. Even after a user obtains an approval to access the framework, it must certify a specific permitted purpose for every access request. The level of access is dependent on the stated purpose.

42. For example, when a user certifies a request is for "treatment purposes," it is granted full patient record access. The end point storing the responsive patient information (such as Plaintiffs' healthcare provider or its vendor) automatically responds with data commensurate with the stated purpose to fulfill the request. Pursuant to the CCA and Common Agreement, generally speaking, the responding entity is required to respond to the request.

43. Only healthcare providers are permitted to certify a request for treatment purposes to gain access to full patient records from participating organizations. Other legitimate purposes including payment, healthcare operations, public health activities, etc. provide access to a more limited subset of information necessary and appropriate to meet those purposes. Non-treatment providers, such as insurance companies, are not permitted to gain access to full patient records. Treatment providers, on the other hand, are appropriately provided with complete access.

44. Defendant is fully aware of the sensitivity of the information its network transmits.

Defendant is also aware of the potential for abuse such access to these frameworks provides.

***The Data Breach Was Caused By Defendant's Failures***

45. Defendant failed to take adequate steps to vet candidates for its network. Notably, according to the Epic complaint (¶¶ 132–146), Defendant onboarded the same entities even after they were rejected by others because investigations revealed that their activities were not for treatment purposes, as stated. Defendant did not identify the same suspicious behavior, or did not care, and Defendant onboarded them and allowed them to engage in their fraudulent schemes undisturbed.

46. For example, one entity it onboarded was named Integritort. The use of the word "tort" in the name should have set off alarms that it was a marketer to mass tort and class action law firms.

47. Another entity called Constant Care Health queried the network for more than 59,000 records while sharing only 80 back before Defendant was forced to end CCH's access. This heavily skewed one-way traffic, or "nonreciprocal" sharing, is highly suspicious. Typical healthcare providers share and query at a 1:1 ratio, and not volumes that are out of proportion to their size.

48. Defendant onboarded RavillaMed after it was already kicked off of the Carequality network by another Implementer. RavillaMed engaged in unusual activity over the network, requesting tens of thousands of complete patient records per month in a non-reciprocal manner.

49. RavillaMed is closely associated with and has common ownership and management with another entity, LlamaLab, that openly markets to law firms a service providing for same-day medical records and related services.

50. Mammoth Path Solution and Mammoth Dx have taken over 140,000 patient records

through Carequality and TEFCA from Epic's clients alone in highly non-reciprocal record exchanges. In an attempt to appear more legitimate, these companies began to add "clinical information" into the patient records to make it look as though they were treating patients. But the information they added was fictional.

51. GuardDog and SelfRx also requested patient records in huge numbers in a non-reciprocal pattern and were managed by individuals who had a professional history as mass tort medical consultants.

52. Defendant failed to put a stop to the bad actors, even after it had more than enough knowledge of their abuse of the network. Defendant not only failed to stop it, but also defended the bad actors from attempts by other organizations to enforce the rules, deflecting blame, and inventing pretexts to keep the scheme alive. When others confronted Defendant with evidence of abuse, Defendant ignored the obvious and refused to take the actions to terminate the bad actors' access to the networks.

***The Data Breach Was Foreseeable***

53. It is common knowledge that businesses that store personal information are likely to be targeted by fraudsters and criminals, to hold the systems for ransom and to sell the personal data on the black market so the buyers can commit identity theft and make other illicit profits off of the data.

54. The intimate, comprehensive, and confidential financial and health data at issue here is some of the most valuable to identity thieves, advertisers, lenders, creditors, insurers, and other businesses.

55. Defendant knew or should have known that it was an ideal target for abuse and that bad actors with nefarious purposes would attempt to access the network for illegitimate reasons by

posing as treatment providers when they were not and falsely requesting records for treatment purposes.

56. Indeed, the FBI has publicly warned the healthcare industry to bolster its data security against the increasing frequency and sophistication of attacks. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the PHI."[2]

57. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[3]

58. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset to criminal organizations and unscrupulous actors in legitimate businesses. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[4] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization,

[2] Jim Finkle, FBI warns healthcare firms that they are targeted by hackers, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820, (last visited May 20, 2026).

[3] Identity Theft Resource Center, 2018 End-of-Year Data Breach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf, (last visited May 20, 2026).

[4] 2019 HIMSS Cybersecurity Survey, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited May 20, 2026).

including credit bureaus, have so much monetizable information stored in their data centers."[5] This trend has continued more recently. Data breaches have become alarmingly commonplace in the U.S. In 2021, data breaches increased by nearly 70% over the previous year, which is over 20% higher than the previous all-time high.[6]

59. Furthermore, the healthcare sector was the easiest "mark" among all major sectors in 2021, meaning it had the highest number of data compromises and categorically had some of the most widespread exposure per data breach.[7] According to the 2021 Healthcare Information and Management Systems Society Cybersecurity Survey, 67% of participating hospitals reported having a significant security incident within the last twelve months, with a majority of those being caused by "bad actors."[8]

60. Healthcare providers and vendors that maintain healthcare provider data "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[9]

61. Defendant knew the importance of guarding the gateway to patients' Private

---

[5] Eyal Benishti, How to Safeguard Hospital Data from Email Spoofing Attacks, Chief Healthcare Executive (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguardhospital-data-from-email-spoofing-attacks, (last visited May 20, 2026).

[6] *2021 Annual Data Breach Year-End Review*, ITRC, (Jan. 2022), https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2//

[7] *Id.*

[8] *2021 HIMSS Cybersecurity Survey*, Healthcare Information and Management Systems Society, Inc., accessible at: https://www.himss.org/resources/himss-healthcare-cybersecurity-survey (last accessed Mar. 16, 2022).

[9] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospitaldata-from-email-spoofing-attacks.

Information entrusted to it and of the foreseeable consequences if that data was disclosed to bad actors. Defendant failed to implement and maintain adequate due diligence, vetting, and monitoring practices and procedures to prevent the Data Breach from occurring.

62. Defendant was notified by Epic in September 2022 that certain entities were accessing patient records through its network and therefore had knowledge at least as early as then that bad actors were manipulating the network to get patient records for prohibited purposes in violation of the Carequality and TEFCA rules and the law.

63. Defendant has the resources and responsibility to invest in the necessary data security and protection measures commensurate with the stakes and its role. Yet, Defendant failed to undertake adequate analyses and testing of its own systems and other data security measures to avoid the failures that resulted in the Data Breach.

***Patient Records Are Highly Valuable***

64. The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[10]

65. Stolen PII and PHI are valuable commodities to identity thieves. The purpose of stealing patient records, like in this Data Breach, is to use the data for illicit purposes or to sell the data for profit to other criminals who buy the data and misuse it. Health records are so valuable because it is so broad, and it can therefore be used for a wide variety of criminal activity such as

---

[10] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited May 20, 2026). http://www/ftc/gov/speeches/harbour/091207privacyroundtable.pdf.

creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers, opening new financial accounts, obtaining government benefits, filing fraudulent tax returns, giving false information to police during an arrest, taking out loans, and to obtain medical services.[11]

66. Advertisers, credit agencies, and merchants covet medical records because virtually every other aspect of consumer behavior can be recorded, tracked, and analyzed. On the other hand, medical records are generally off limits for these companies, but they contain reams of valuable insight into consumers' interests, behaviors, purchase history, and ability to pay back a loan.

67. According to a Trustwave report, a healthcare data record may be valued up to $250 per record on the black market compared to $5.40 for the next highest value (a payment card).[12]

68. Healthcare related data is among the most sensitive and personally consequential when compromised. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery" reported Pam Dixon, executive director of World Privacy Forum.[13] A report focusing on health care breaches found that the "average total cost to resolve an identity theft related incident came to about $20,000."[14]

---

[11] *What to Know About Identity Theft,* FED TRADE COMM'N (April 2021), https://consumer.ftc.gov/articles/what-know-about-identity-theft/

[12] https://www.securelink.com/blog/healthcare-data-new-prize-hackers citing https://trustwave.azureedge.net/media/16096/2019-trustwave-global-security-report.pdf?rnd=132056250120000000. (last visited May 20, 2026).

[13] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited May 20, 2026).

[14] Elinor Mills, Study: Medical Identity theft is costly for victims, CNET (Mar.3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-for-victims/ (last visited May 20, 2026).

69. Medical information is some of the highest value data to criminals.[15] In fact, according to the FBI's Cyber Division, healthcare records can be sold by criminals for 50 times the price of stolen Social Security numbers or credit card numbers. By one estimate, PHI can sell for as much as $363 according to the Infosec Institute.[16] And files containing PHI can be bought on the black market for between $1,200 and $1,300 each.[17] This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[18] Likewise, the FBI has warned healthcare organizations that their data is worth 10 times as much as personal credit card data on the black market.[19]

70. Thus, the compromised patient records of Plaintiffs and Class members have a high

---

[15] Calculating the Value of a Data Breach -What are the Most Valuable Files to a Hacker" Donnellon McCarthy Enters (July 21, 2020) https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited May 20, 2026).

[16] Data Breaches: In the Health Care Sector, Center for Internet Security, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited May 20, 2026).

[17] Elizabeth Clarke, Hackers Sell Health Insurance Credentials, Bank Accounts, SSNs, and Counterfeit Documents Secure Works (July 15, 2013), https://www.secureworks.com/blog/general-hackers-sell-health-insurance-credentials-bank-accounts-ssns-and-counterfeit-documents (last visited May 20, 2026).

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonaldata-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[19] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/uscybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-cardidUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, AHS can and should perform (or hire a third-party expert to perform).

value in both legitimate and black markets. Plaintiffs and Class members have now been injured by unauthorized third parties profiting off of the value of their confidential information.

***The Data Breach Justifies Reasonable Mitigation Efforts***

71. It is well recognized that in data breaches, fraudulent activity may not show up for prolonged periods of time—potentially years after PHI and PII are divulged. And victims only discover their harms after they receive collection letters for debts they never incurred.[20]

72. Despite Defendant's failure to protect Plaintiffs' and Class members' Private Informaiton, Defendant has not offered Plaintiffs or Class members any recourse.

73. Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their health-related information. Plaintiffs and Class members, as current and former patients of providers who rely on the frameworks, relied on Defendant to honor its contractual and ethical obligations to guard the gateway to their records, to ensure the integrity of the system, the confidentiality of their records, and to allow only authorized disclosure of their information.

74. In an effort to mitigate the risk and potential losses, Plaintiffs will have to spend time reviewing treatment information, health records, bills, financial transaction records, and insurance information looking for suspicious activity. To be safe, they have to cast a wide net and assume that everything about them was taken and used for the worst possible purposes. They have to assume that their patient records are in the hands of identity thieves that have already profited off of their data. Plaintiffs will continue to spend time in the future monitoring accounts, insurance claims, explanations of benefits, patient records, doctor's notes, and they will remain at risk for

[20] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, Experian (Apr. 2010) https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited May 20, 2026).

future identity theft (financial and medical). These mitigation and monitoring efforts are reasonable in light of the current and future risk of identity theft.

75. Plaintiffs also must deal with their emotional distress, fears, uncertainties, and discomfort presented by the risk that bad actors inserted false treatment information in their records that could end up hurting them when a doctor mistakenly relies on false information in their treatment. Indeed, according to the Epic complaint (*see e.g.*, ¶ 129), the bad actors that Defendant shared Plaintiffs' and Class members' data with were inserting fake information into the records of patients they queried to conceal their fraudulent purposes. Typical treatment providers will query a record and then add information to that patient's record in the course of treating the patient, resulting in a reciprocal exchange of information. However, Defendant's users were engaged in non-reciprocal queries where they only took records without adding information. When red flags about their suspicious activities were raised, the users changed their names, evaded responsibility and then came back with a way to conceal their activities by adding false information to the records they requested to make their activities resemble legitimate activity. As a result, Plaintiffs might have false information in their records that in the future could cause a doctor to make an incorrect diagnosis or recommend a non-optimal (or worse) course of treatment.

## B. Defendant's Conduct Violates HIPAA and Industry Standard Data Security Practices

75. Title II of HIPAA contains what are known as the Administrative Simplification provisions.[21] 42 U.S.C. §§ 1301, et seq. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality,

[21] HIPAA lists eighteen types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, inter alia: names, addresses, any dates including dates of birth, social security numbers, and medical record numbers.

integrity, and security of Private Information is properly maintained.[22]

76. The Data Breach resulted from Defendant's failures to comply with safeguards mandated by HIPAA regulations and industry standards. The security failures include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

d. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

e. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

f. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

g. Failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §

---

[22] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

164.306(a)(3);

h. Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

i. Failing to implement technical policies and procedures for electronic information systems that maintain electronic Private Information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. §164.312(a)(1);

j. Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

k. Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

l. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

***Plaintiffs and Class Members Suffered Long-Lasting Damages***

77. As a direct and proximate result of Defendant's wrongful actions and inaction, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to

mitigate the actual and potential impact of the Data Breach on their lives.

78. As a result of the Defendant's failure to prevent the Data Breach, Plaintiffs and Class members have suffered, will suffer, or are at increased risk of suffering:

a. The compromise, publication, theft and/or unauthorized use of their patient records to unknown third parties;

b. Unauthorized use and misuse of their information;

c. The loss of the opportunity to control how their information is used;

d. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f. The imminent and certain impending injury flowing from potential fraud and identity theft posed by their records being placed in the hands of criminals;

g. The continued risk to their records are subject to further breaches so long as Defendant fails to undertake appropriate measures; and

h. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

79. In addition to a remedy for the economic harm, Plaintiffs and Class members

maintain an undeniable and continuing interest in ensuring that their patient records are secure and remain secure.

***Plaintiffs' Experiences & Injuries***

*Plaintiff Lott's Experiences*

80. Plaintiff Lott was a patient of University of Illinois Hospital & Health Sciences System, one of Defendant's clients.

81. As a condition of obtaining medical services from University of Illinois Hospital & Health Sciences System, Plaintiff Lott was required to provide Defendant with his Private Information.

82. Upon information and belief, Defendant was in possession of Plaintiff Lott's Private Information before, during, and after the Data Breach.

83. Plaintiff provided his Private Information to University of Illinois Hospital & Health Sciences System, and trusted that it would use reasonable measures to protect it according to state and federal law.

84. In entrusting his Private Information to University of Illinois Hospital & Health Sciences System, Plaintiff Lott believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendant.

85. Plaintiff Lott greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

86. Plaintiff Lott stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

87. As a result of the Data Breach, Plaintiff Lott believes his Private Information was or will soon be published on the dark web.

88. As a result of the Data Breach, Plaintiff Lott has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

89. The Data Breach has caused Plaintiff Lott to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying his of the fact that his Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

90. Plaintiff Lott anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

91. Plaintiff Lott has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

92. As a direct and traceable result of the Data Breach, Plaintiff Lott suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach,

including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now have his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and noneconomic harm.

*Plaintiff Hughes' Experiences*

93. Plaintiff Hughes was required to provide and did provide her Private Information to Defendant as a condition of receiving medical services from Defendant's client.

94. Plaintiff Hughes was damaged by the compromise of her Private Information in the Data Breach which was impacted and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

95. Plaintiff Hughes typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

96. Plaintiff Hughes stores any documents containing her Private Information in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

97. As a result of the Data Breach, Plaintiff Hughes has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach.

In response to the Data Breach, Plaintiff has spent significant time monitoring her accounts and credit score, changing her online account passwords and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

98. Plaintiff Hughes also suffered actual injury in the form of damages to and diminution in the value of her Private Information — a form of intangible property that she entrusted to Defendant for the purpose of obtaining services from Defendant's client, which was compromised in and as a result of the Data Breach.

99. Plaintiff Hughes suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

100. Plaintiff Hughes has suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that she must remain vigilant for the remainder of her life.

101. Plaintiff Hughes has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

102. Defendant obtained and continues to maintain Plaintiff Hughes's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiff, however, would not have entrusted her Private Information to Defendant had she known that it would fail to maintain adequate data security. Plaintiff's Private Information was compromised and disclosed as a result of the Data Breach.

103. As a result of the Data Breach, Plaintiff Hughes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

*Plaintiff Malenkovich's Experiences*

104. Plaintiff Malenkovich was required to provide and did provide her Private Information to Defendant as a condition of receiving medical services from Defendant's client.

105. Plaintiff Malenkovich was damaged by the compromise of her Private Information in the Data Breach which was impacted and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

106. Plaintiff Malenkovich typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

107. Plaintiff Malenkovich stores any documents containing her Private Information in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

108. As a result of the Data Breach, Plaintiff Malenkovich has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff has spent significant time monitoring her accounts and credit score, changing her online account passwords and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

109. Plaintiff Malenkovich also suffered actual injury in the form of damages to and diminution in the value of her Private Information — a form of intangible property that she entrusted to Defendant for the purpose of obtaining services from Defendant's client, which was compromised in and as a result of the Data Breach.

110. Plaintiff Malenkovich suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

111. Plaintiff Malenkovich has suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that she must remain vigilant for the remainder of her life.

112. Plaintiff Malenkovich has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

113. Defendant obtained and continues to maintain Plaintiff Malenkovich's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiff, however, would not have entrusted her Private Information to Defendant had she known that it would fail to maintain adequate data security. Plaintiff's Private Information was compromised and disclosed as a result of the Data Breach.

114. As a result of the Data Breach, Plaintiff Malenkovich anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

*Plaintiff Hawkins' Experiences*

115. Plaintiff Hawkins is a patient of Mosaic Life Care, one of Defendant's clients.

116. As a condition of obtaining medical services from Mosaic Life Care, Plaintiff Hawkins was required to provide Defendant with her Private Information.

117. Upon information and belief, Defendant was in possession of Plaintiff Hawkins's Private Information before, during, and after the Data Breach.

118. Plaintiff provided her Private Information to Mosaic Life Care and trusted that it would use reasonable measures to protect it according to state and federal law.

119. In entrusting her Private Information to Mosaic Life Care, Plaintiff Hawkins believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would not have entrusted her Private Information to Defendant.

120. Plaintiff Hawkins greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

121. Plaintiff Hawkins stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

122. As a result of the Data Breach, Plaintiff Hawkins believes her Private Information was or will soon be published on the dark web.

123. As a result of the Data Breach, Plaintiff Hawkins has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

124. As a result of the Data Breach, Plaintiff Hawkins experienced multiple

unauthorized charges to on her account, causing Plaintiff to spend time disputing the charges, cancelling the card, and waiting to receive a new debit card from her bank.

125. The Data Breach has caused Plaintiff Hawkins to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

126. Plaintiff Hawkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

127. Plaintiff Hawkins has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

128. As a direct and traceable result of the Data Breach, Plaintiff Hawkins suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now have her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and

noneconomic harm.

*Plaintiff Brink's Experiences*

129. Plaintiff Brink was a patient of University of Pittsburg Medical Center, one of Defendant's clients.

130. As a condition of obtaining medical services from University of Pittsburg Medical Center, Plaintiff Brink was required to provide Defendant with his Private Information.

131. Upon information and belief, Defendant was in possession of Plaintiff Brink's Private Information before, during, and after the Data Breach.

132. Plaintiff provided his Private Information to University of Pittsburg Medical Center, and trusted that it would use reasonable measures to protect it according to state and federal law.

133. In entrusting his Private Information to University of Pittsburg Medical Center, Plaintiff Brink believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendant.

134. Plaintiff Brink greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

135. Plaintiff Brink stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

136. As a result of the Data Breach, Plaintiff Brink believes his Private Information was or will soon be published on the dark web.

137. As a result of the Data Breach, Plaintiff Brink has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

138. Plaintiff Brink experienced multiple unauthorized charges to on his account, causing Plaintiff to spend time disputing the charges, cancelling the card, and waiting to receive a new debit card from his bank.

139. The Data Breach has caused Plaintiff Brink to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying his of the fact that his Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

140. Plaintiff Brink anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

141. Plaintiff Brink has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

142. As a direct and traceable result of the Data Breach, Plaintiff Brink suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit

reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now have his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and noneconomic harm.

*Plaintiff Berry's Experiences*

143. Plaintiff Berry is a patient of one of Defendant's clients and received a data breach notice letter.

144. As a condition of obtaining medical services, Plaintiff Berry was required to provide Defendant with his Private Information.

145. Upon information and belief, Defendant was in possession of Plaintiff Berry's Private Information before, during, and after the Data Breach.

146. Plaintiff provided his Private Information and trusted that it would use reasonable measures to protect it according to state and federal law.

147. In entrusting his Private Information, Plaintiff Berry believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendant.

148. Plaintiff Berry greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very

concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

149. Plaintiff Berry stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

150. As a result of the Data Breach, Plaintiff Berry believes his Private Information was or will soon be published on the dark web.

151. As a result of the Data Breach, Plaintiff Berry has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

152. The Data Breach has caused Plaintiff Berry to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

153. Plaintiff Berry anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

154. Plaintiff Berry has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

155. As a direct and traceable result of the Data Breach, Plaintiff Berry suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now have his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and noneconomic harm.

*Plaintiff Patterson's Experiences*

156. Plaintiff Patterson is a patient of University of Virginia Health System ("UVA Health"), one of Defendant's clients.

157. As a condition of obtaining medical services from UVA Health, Plaintiff Patterson was required to provide Defendant with his Private Information.

158. Upon information and belief, Defendant was in possession of Plaintiff Patterson's Private Information before, during, and after the Data Breach.

159. Plaintiff provided his Private Information to UVA Health and trusted that it would use reasonable measures to protect it according to state and federal law.

160. In entrusting his Private Information with UVA Health, Plaintiff Patterson believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would

not have entrusted his Private Information to Defendant.

161. Plaintiff Patterson greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

162. Plaintiff Patterson stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

163. As a result of the Data Breach, Plaintiff Patterson believes his Private Information was or will soon be published on the dark web.

164. As a result of the Data Breach, Plaintiff Patterson has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

165. The Data Breach has caused Plaintiff Patterson to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

166. Plaintiff Patterson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

167. Plaintiff Patterson has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

168. As a direct and traceable result of the Data Breach, Plaintiff Patterson suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now have his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and noneconomic harm.

*Plaintiff Jackson's Experiences*

169. Plaintiff Jackson is a patient of St. Joseph's hospital, one of Defendant's clients.

170. As a condition of obtaining medical services from St. Joseph's hospital, Plaintiff Jackson was required to provide Defendant with his Private Information.

171. Upon information and belief, Defendant was in possession of Plaintiff Jackson's Private Information before, during, and after the Data Breach.

172. Plaintiff provided his Private Information to St. Joseph's hospital and trusted that it would use reasonable measures to protect it according to state and federal law.

173. In entrusting his Private Information with St. Joseph's hospital, Plaintiff Jackson

believed that any vendors it chose like Defendant, would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendant.

174. Plaintiff Jackson greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

175. Plaintiff Jackson stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

176. As a result of the Data Breach, Plaintiff Jackson believes his Private Information was or will soon be published on the dark web.

177. As a result of the Data Breach, Plaintiff Jackson has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

178. The Data Breach has caused Plaintiff Jackson to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

179. Plaintiff Jackson anticipates spending considerable time and money on an ongoing

basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

180. Plaintiff Jackson has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

181. As a direct and traceable result of the Data Breach, Plaintiff Jackson suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now have his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and noneconomic harm.

## CLASS ALLEGATIONS

182. Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Nationwide Class:

> All persons in the United States whose Private Information was impacted in Defendant's Data Breach (the "Class").

183. Excluded from the class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the class; government entities; and the judge to

whom this case is assigned and his immediate family and court staff.

184. Plaintiffs reserve the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or Classes defined differently than above before any court determines whether certification is appropriate.

185. **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiffs believes that there are thousands of members of the Class, if not more. The number of impacted individuals remains unknown and unreported, and Plaintiffs believes additional entities and persons may have been affected by the Data Breach. The precise number of Class members, however, is unknown to Plaintiffs. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

186. **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a. Whether Defendant violated the laws asserted herein;

b. Whether Defendant knew or should have known that its data environment and security measures created a risk of a data breach;

c. Whether Defendant controlled and took responsibility for protecting Plaintiffs' and the Class members' data;

d. Whether Defendant's security measures were reasonable considering the

FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

e. Whether Defendant owed Plaintiffs and Class members a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the Private Information it collected, stored, and maintained from Plaintiffs and Class members;

f. Whether Defendant owed Plaintiffs and Class members a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the Private Information it collected, stored, and maintained from Plaintiffs and Class members;

g. Whether Defendant's failure to adequately secure Plaintiffs' and Class members' data constitutes a breach of its duty to institute reasonable security measures;

h. Whether Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiffs' and Class members' data;

i. Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

j. Whether Plaintiffs and Class members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its data systems; and

k. Whether Plaintiffs and the Class are entitled to damages and/or equitable relief.

187. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical class members. Just like every other class member, Plaintiffs provided their data to treatment providers and Defendant allowed bad actors to request, access, view, and take Plaintiffs' data from Plaintiffs' treatment providers without a lawful purpose and only a nefarious purpose to profit off of the records. Plaintiffs' injuries are similar to other class members.

188. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs area adequate representative of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for themselves and for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs have also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

189. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

190. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class

as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

## COUNT I
**Negligence**

191. Plaintiffs repeat and re-alleges paragraphs 1 through 190 above as if fully set forth herein.

192. Defendant had full knowledge of the sensitivity of the Plaintiffs' and Class members' patient records, and the types of harm that Plaintiffs and Class members could and would suffer if Defendant permitted the information to be wrongfully disclosed.

193. By participating in the TEFCA and Carequality networks as an Implementer, Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, securing, protecting, and safeguarding their patient records. Defendant owed a duty to prevent the patient records from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

194. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. That duty included, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' Private Information in Defendant's possession was adequately secured and protected, that Plaintiffs' and Class Members' Private Information on Defendant's networks was not accessible to criminals without authorization, and that Defendant's employees tasked with maintaining such information were adequately trained on security measures regarding the security of Plaintiffs' and Class Members' Private Information.

195. Plaintiffs and Class Members entrusted their Private Information to Defendant with the understanding that Defendant would safeguard their information, use their Private Information for business purposes only, and not disclose their Private Information to unauthorized third parties.

196. Defendant knew or reasonably should have known that a failure to exercise due care in the collecting, storing, and using Plaintiffs' and Class Members' Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members.

197. Defendant had a duty to protect Plaintiffs' and the Class Members' Private Information as the custodian of their Private Information, which Plaintiffs and Class Members were required to submit to Defendant in connection with the services Defendant provides.

198. Defendant had a duty to comply with industry standard data protection and policy measures, the FTC Act, and HIPAA in its collection, storage, and management of Private Information.

199. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' Private Information.

200. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of prior data breaches and disclosures prevalent in today's digital landscape.

201. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Plaintiffs' and Class Members' Private Information, the critical importance of providing adequate security of that information, the necessity for encrypting Private Information stored on Defendant's systems, and that it had inadequate IT security protocols in place to secure Plaintiffs' and Class Members' Private Information.

202. Defendant's misconduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, failure to take the steps and opportunities to prevent the Data Breach as set forth herein.

203. Plaintiffs and Class Members had no ability to protect their Private Information that was in Defendant's possession.

204. Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

205. Defendant had a duty to timely disclose that Plaintiffs' and Class Members' Private Information within its possession was compromised and precisely the type(s) of information that were compromised. Defendant breached this duty by failing to disclose the Data Breach after it had been detected.

206. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

207. Defendant systematically failed to provide adequate security for data in its possession.

208. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within its possession.

209. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

210. Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information within its possession

might have been compromised and precisely the type of information compromised.

211. Defendant's breach of its duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

212. But for all of Defendant's acts of negligence detailed above, including allowing cyber criminals to access its systems containing Plaintiffs' and Class Members' Private Information, such information would not have been compromised.

213. Plaintiffs never transmitted their own unencrypted Private Information over the internet or any other unsecured source.

214. Following the Data Breach, Plaintiffs' Private Information has been seized by unauthorized third parties who are now free to exploit and misuse that Private Information, and Plaintiffs are unable to prevent its further dissemination. Plaintiffs' Private Information is forever compromised.

215. But for the Data Breach, Plaintiffs would not have incurred the loss and publication of their Private Information and other injuries.

216. There is a close causal connection between Defendant's failure to implement security measures to protect Plaintiffs' and Class Members' Private Information and the harm suffered, or risk of imminent harm suffered by Plaintiffs and Class Members. Plaintiffs' and Class Members' Private Information was accessed and compromised as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures and encryption.

217. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, loss of privacy, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private

Information.

218. As a result of Defendant's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

219. Plaintiffs seek the award of actual damages on behalf of themselves and the Class.

220. Plaintiffs seek injunctive relief on behalf of the Class in the form of an order (1) compelling Defendant to institute appropriate data collection and safeguarding methods and policies with regard to Private Information; and (2) compelling Defendant to provide detailed and specific disclosure of what types of Private Information have been compromised as a result of the data breach.

## COUNT II
## Breach of Implied Contracts

221. Plaintiffs repeat and re-alleges the allegations contained in paragraphs 1 through 190, as if fully set forth herein.

222. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiffs' and Class Members' Private Information, comply with its statutory and common law duties to protect Plaintiffs' and Class Members' Private Information, and to timely notify them in the event of a data breach.

223. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's provision of services. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant's clients.

224. When entering into implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and

common law duties to adequately protect Plaintiffs' and Class Members' Private Information and to timely notify them in the event of a data breach.

225. Defendant's implied promise to safeguard Private Information is evidenced by, *e.g.*, the representations in its Privacy Policies.

226. Plaintiffs and Class Members would not have provided their Private Information to Defendant had they known that Defendant would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

227. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendant.

228. Defendant breached its implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

229. The losses and damages Plaintiffs and Class Members sustained, include, but are not limited to:

a. Theft of their Private Information;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their Private Information;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future

consequences of the Data Breach – including finding fraudulent charges, cancelling, and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

230. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT III
**Unjust Enrichment**

231. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 190, as if fully set forth herein.

232. Plaintiffs and Class members do not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

233. Plaintiffs and Class members conferred a benefit on Defendant. Specifically, they provided patient record information and agreed to allow network access of their records to allow treatment providers to share their records to participants in the network for permissible purposes, which Defendant shared with unauthorized persons for monetary gain. The benefits of electronic records result in reduced transaction administration, and treatment costs, which benefit users and Implementers, like Defendant. The alternative was for Plaintiffs and Class members to insist that their patient records be kept off the network, which would defeat the network effects that the TEFCA and Carequality network are designed to foster. Defendant abused its access to networks, and the trust of network participants, to unlawfully profit from the system and its contributors. If trust is lost, then the whole system breaks down.

234. Defendant accepted and retained the benefits.

235. Defendant disclosed Plaintiffs' and Class members' patient records through inequitable actions and omissions. Under the circumstances, it would be unjust for Defendant to retain the benefits that that it received from this wrongful and conduct. Plaintiffs and Class members have a superior equitable interest on the proceeds of Defendant's wrongful conduct because the proceeds were gained by profiting from their information, and invading their privacy, and the ways in which bad actors used the patient records to cause injuries to Plaintiffs and Class

members, such as by identity theft, invading their solitude with advertisements, being denied credit applications, getting a claim denied, or not being denied a job opportunity because their patient records may ultimately end up in the hands of identity thieves, advertisers, lenders, insurance companies, and employers.

236. Plaintiffs and Class members are entitled to full refunds, restitution, and/or damages from Defendant and an order disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation.

**COUNT IV**
**Injunctive/Declaratory Relief**

237. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 162, as if fully set forth herein.

238. Defendant owes a duty of care to Plaintiffs and Class Members requiring it to adequately secure Private Information.

239. Defendant still stores Plaintiffs' and Class Members' Private Information.

240. Since the Data Breach, Defendant has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

241. Defendant has not satisfied its legal duties to Plaintiffs and Class Members.

242. Actual harm has arisen in the wake of the Data Breach regarding Defendant's duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information,

and Defendant's failure to address the security failings that led to that exposure.

243. Plaintiffs, therefore, seek a declaration: (a) that Defendant's existing security measures do not comply with its duties of care to provide adequate security; and (b) that to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a. ordering that Defendant engage third-party security auditors as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c. ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d. ordering that Defendant segment Private Information by, among other things, creating firewalls and access controls so that if one area of Defendant's system is compromised, hackers cannot gain access to other portions of Defendant's system;

e. ordering that Defendant purge, delete, and destroy in a reasonably secure manner Private Information not necessary for its provision of services;

f. ordering that Defendant conduct regular computer system scanning and security checks; and

g. ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach

when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, on behalf of all others similarly situated, request that this Court award relief as follows:

A. An order certifying the class and designating Plaintiffs as Class Representatives and the undersigned as Class Counsel;

B. An award to Plaintiffs and the proposed Class members of damages and equitable relief with pre-judgment and post-judgment interest;

C. Declaratory judgment in favor of Plaintiffs and the Class finding that Defendant owed, and continues to owe a legal duty to secure the sensitive Private Information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, the FTC Act, and HIPAA; that Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its clients' patients' Private Information; and that Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class;

D. Injunctive relief to employ reasonable measures to secure patient record information;

E. An award of attorneys' fees and costs as allowed by law; and

F. An award such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all such claims that may be so tried, with the maximum

number of jurors permitted by law.

Dated: November 18, 2026

Respectfully submitted,

By: /s/ Jeff Ostrow
Jeff Ostrow (FBN 121452)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Mariya Weekes (FBN 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (866) 252-0878
mweekes@milberg.com

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
**Zimmerman Law Offices, P.C.**
7199 S. Kingery Highway, Unit 1148
Willowbrook, Illinois 60527
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
Email: firm@attorneyzim.com

*Interim Class Counsel for Plaintiffs*